Argued and submitted October 19, 2018; convictions on Counts 1, 4, 5, and 6 reversed and remanded, reversed and remanded to address merger in a manner consistent with this opinion, remanded for resentencing, otherwise affirmed April 7, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARCUS LOINU PAYE,
aka Loinu Mark Paye, aka Marcus Paye,
aka Mark Paye, aka Mark Loinu Paye,
*Defendant-Appellant.*

Multnomah County Circuit Court
15CR50132; A162421

486 P3d 808

Defendant appeals a judgment of conviction for two counts of compelling prostitution and seven counts of promoting prostitution. He assigns error to, among other things, the trial court's (1) acceptance of nonunanimous verdicts on Counts 1, 4, 5, and 6, (2) denial of defendant's motion to suppress evidence obtained from his electronic devices, and (3) failure to merge the guilty verdicts on all counts of promoting prostitution (Counts 2, 3, 5, 6, 14, 15, and 16). Defendant asserts that the warrant to search for evidence of his crimes on his electronic devices was overbroad. Defendant argues that all counts of promoting prostitution should merge with Count 16 because Count 16, predicated on defendant maintaining a prostitution enterprise over a period of time, was supported by the conduct underlying other counts of promoting prostitution, which were all predicated on specific instances of unlawful conduct. *Held*: The trial court erred in accepting nonunanimous verdicts on Counts 1, 4, 5, and 6. The court did not err in denying defendant's motion to suppress evidence obtained from his electronic devices, because the warrant articulated with specificity the type of evidence that it would be reasonable to believe would be on defendant's computer and, under the standards for searches of electronic devices, was not overbroad. *See State v. Mansor*, 363 Or 185, 421 P3d 323 (2018). As for the remaining counts of promoting prostitution, the court also erred in failing to merge the guilty verdicts on each of Counts 2, 3, 14, and 15 with the guilty verdict on Count 16.

Convictions on Counts 1, 4, 5, and 6 reversed and remanded; reversed and remanded to address merger in a manner consistent with this opinion; remanded for resentencing; otherwise affirmed.

Karin Johana Immergut, Judge. (Judgment and Amended Judgments)

John A. Wittmayer, Judge. (Judgment of Dismissal)

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G.

Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and Lagesen, Judge, and Aoyagi, Judge.*

LAGESEN, J.

Convictions on Counts 1, 4, 5, and 6 reversed and remanded; reversed and remanded to address merger in a manner consistent with this opinion; remanded for resentencing; otherwise affirmed.

_____

* Lagesen, J., *vice* Hadlock, J. pro tempore.

**LAGESEN, J.**

Defendant appeals a judgment of conviction for two counts of compelling prostitution in violation of ORS 167.017 and seven counts of promoting prostitution in violation of ORS 167.012. He raises numerous assignments of error, including to the trial court's acceptance of nonunanimous verdicts on the two counts of compelling prostitution and two of the counts of promoting prostitution (Counts 1, 4, 5, and 6). As required by the Sixth and Fourteenth Amendments to the United States Constitution under *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), and *State v. Ulery*, 366 Or 500, 464 P3d 1123 (2020), we reverse the convictions on which the jury did not unanimously agree. We conclude further that the guilty verdicts on Counts 2, 3, 14, and 15 each merge with the guilty verdict on Count 16 and remand for further proceedings consistent with that conclusion. We otherwise reject or do not reach the remaining assignments of error.

I.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant ran a prostitution business. He promoted the business by advertising women on Backpage.com. He also encouraged and sometimes compelled women to have sex for money; they would then give defendant the money.

In July 2015, S met defendant at a MAX station the day before her eighteenth birthday. She was with defendant for about a week. At some point during that time, defendant threatened to kill her and her family if she did not make money for him by having sex with others. So S did exactly that. Defendant took her to 82nd Avenue in Portland, where she had sex for money with two different men and then gave the money to defendant. Afterward, they returned to defendant's residence, from which S escaped that night while defendant was sleeping.

About three months later, having obtained a fair amount of information indicating that defendant was involved in a prostitution business, officers executed a search warrant on defendant's residence, seeking evidence of defendant's involvement in prostitution-related activities. They found N sleeping in defendant's home. The search pursuant

to the warrant, which authorized the seizure of computers and cell phones from defendant (among other things) and the search of those devices for evidence of defendant's prostitution-related activities, ultimately resulted in the discovery of a large amount of evidence (both directly and derivatively) that defendant had been engaged in promoting prostitution. Officers discovered that defendant had been advertising N on Backpage.com around the time they executed the warrant. They also discovered that, at the end of 2014, defendant had been advertising a different woman, H, on Backpage.com, along with other evidence of defendant's general involvement in the prostitution business.

As a result of those discoveries, the state charged defendant with nine offenses related to S, N, and H.[1] Regarding S, the state charged defendant with two counts of compelling prostitution (Counts 1 and 4) and four counts of promoting prostitution (Counts 2, 3, 5, and 6). Regarding N, the state charged defendant with one count of promoting prostitution (Count 15). Regarding H, the state charged defendant with two counts of promoting prostitution (Counts 13 and 14). The state also charged defendant with one count of promoting prostitution that did not allege that defendant's promoting activities involved a particular individual (Count 16).

Before trial, defendant moved to suppress the evidence discovered pursuant to the search warrant on the ground that the warrant was overbroad and did not comport with the particularity requirement of Article I, section 9, of the Oregon Constitution. The trial court denied the motion.

Defendant exercised his right to a jury trial and, following trial, the jury found defendant guilty on each of the counts mentioned above. Its verdicts on Counts 1, 4, 5, and 6 were not unanimous; its verdicts on the remaining counts were. Defendant appealed, raising 10 assignments of error. In his first assignment of error, defendant challenges the denial of his motion to suppress. In his second and third

---

[1] The state charged defendant with a number of other prostitution-related offenses, some involving different victims, but some of those charges were severed for trial, the state dismissed some before trial, and the jury acquitted defendant of others.

assignments of error, he contends that the trial court erred by not merging (1) the guilty verdicts for promoting prostitution on Counts 2 and 3; and (2) the guilty verdicts for promoting prostitution on Counts 5 and 6. In his fourth assignment of error, he contends that the court erred by not merging the guilty verdicts on all counts of promoting prostitution (Counts 2, 3, 5, 6, 14, 15, and 16). In his fifth assignment of error, defendant contends that the court erred by declining to merge the guilty verdicts for compelling prostitution on Counts 1 and 4. In his sixth assignment of error, defendant contends that the court erred in categorizing defendant in grid block 8-B on Counts 4 through 6, and in his seventh assignment of error he contends that the court erred in categorizing him in grid block 8-A on Counts 14 through 16. In his eighth assignment of error, he contends that the court plainly erred in imposing a $3,000 compensatory fine. In his ninth assignment of error, he contends that the court erred in instructing the jury that it could return nonunanimous verdicts and that that error requires the reversal of all convictions, including those on which the jury's verdict was unanimous. Finally, in his tenth assignment of error, defendant asserts that the trial court erred in accepting nonunanimous verdicts on Counts 1, 4, 5, and 6.

## II.   ANALYSIS

As we will explain, defendant is entitled to relief on his tenth assignment of error and the reversal of his convictions on Counts 1, 4, 5, and 6. Defendant is not entitled to relief from his convictions on the other counts, but, on this record, the guilty verdicts on Counts 2, 3, 14, and 15 each merge with the guilty verdict on Count 16. Those conclusions obviate the need to address defendant's remaining assignments of error, which present issues that may not recur on remand.

A.   *Nonunanimous Verdicts*

We start with defendant's ninth and tenth assignments of error because our resolution of them has the potential to affect the need to address some of defendant's other assignments of error. Those assignments assert, respectively, that the trial court plainly erred by instructing the jury it could convict defendant by a 10-2 verdict and that

the trial court plainly erred by accepting the nonunanimous verdicts on Counts 1, 4, 5, and 6. As the state correctly concedes, under *Ramos*, 590 US at ___, 140 S Ct at 1401-02, and *Ulery*, 366 Or at 504, defendant is entitled to a reversal of his convictions on Counts 1, 4, 5, and 6, because those convictions were based on nonunanimous verdicts. Defendant is not, however, entitled to reversal of the other convictions that were based on unanimous verdicts. *See State v. Chorney-Phillips*, 367 Or 355, 358-59, 478 P3d 504 (2020); *State v. Ciraulo*, 367 Or 350, 353-54, 478 P3d 502 (2020).

B.  *Motion to Suppress*

In his first assignment of error, defendant challenges the denial of his motion to suppress the evidence obtained from his electronic devices. He contends that the warrant was impermissibly overbroad, in violation of Article I, section 9. Specifically, relying on the analysis in our decision in *State v. Mansor*, 279 Or App 778, 381 P3d 930 (2016) (*Mansor I*), *aff'd*, 363 Or 185, 421 P3d 323 (2018) (*Mansor II*), defendant argues that the warrant was insufficient to comport with the constitution because (1) it lacked temporal limitations; (2) in defendant's view, it was too broad in terms of the items it authorized police to search; and (3) it did not restrict the locations in which police could look for evidence of the crimes that the warrant authorized them to look for.

Defendant's assertion that the warrant was overbroad presents a question of law that we review for legal error. *State v. Savath*, 298 Or App 495, 499, 447 P3d 1, *rev den*, 365 Or 722 (2019). We consider that question in light of the Supreme Court's decision in *Mansor II*. Although the Supreme Court affirmed our decision in that case, its "analysis differ[ed] in some respects from that of" our court in some fairly significant ways. *Mansor II*, 363 Or at 187.

In *Mansor II*, the Supreme Court set forth the considerations for assessing whether a warrant to search for digital evidence on a device such as a computer or a cell phone comports with the particularity requirement of Article I, section 9. 363 Or at 211. The court explained that, to satisfy that requirement, a warrant must identify any items to be searched for and seized with sufficient specificity to allow officers to find them with a reasonable amount of

certainty, and also must not authorize a search that is overbroad, given the probable cause that justifies the search. *Id.* at 212. After considering the unique characteristics of digital evidence that make searches of it and for it very different from searches of and for physical evidence, the Supreme Court concluded as follows:

> "The warrant to search a computer must be based on affidavits that establish probable cause to believe that the computer contains information relevant to the criminal investigation. To meet the particularity requirement of Article I, section 9, the warrant must identify, as specifically as reasonably possible in the circumstances, the information to be searched for, including, if relevant and available, the time period during which that information was created, accessed, or otherwise used. We emphasize, however, based on our discussion of digital devices and computer searches above *** that the forensic examination likely will need to examine, at least briefly, some information or data beyond that identified in the warrant."

*Id.* at 218. The court emphasized that, "when a time-based description of the information sought on a computer is relevant and available to the police, it ordinarily should be set out in the affidavit, and the warrant should include that description." *Id.* But, the court cautioned, "analytically, 'temporal limitations' are more accurately seen as a way of identifying with greater specificity the 'what' that is being searched for, rather than as a separate, independently required element, in meeting the particularity requirement for a computer search." *Id.* The court rejected the argument that the particularity requirement of Article I, section 9, required that a warrant specify the particular locations on a computer or other digital device. *Id.* at 217.

Considering the warrant at issue here in view of the Supreme Court's decision in *Mansor II*, we reject defendant's contentions that it is overbroad.

First, to the extent that defendant argues that the warrant is overbroad because it did not specify the locations on defendant's computer that could be searched, *Mansor II* squarely rejected that contention. *Id.* ("[A] valid warrant to search a computer need not identify 'places' to search at that level of abstraction.").

Second, to the extent that defendant argues that the warrant is overbroad for failing to identify the items that could be searched for, we disagree. Defendant does not dispute that the affidavit supporting the warrant demonstrated probable cause that defendant had committed the crimes of promoting prostitution and compelling prostitution and was engaged in an ongoing enterprise of promoting prostitution, and that evidence of those crimes would be present on defendant's computer. As the affidavit supporting the warrant explained, defendant's conduct came to light after the father of C, one of the women whose prostitution services defendant promoted, reported defendant to police. C reported to police that defendant would have her "walk 82nd" and that she thought defendant would beat her if she did not prostitute for him. C also told police that defendant "had other women working for him," and that she had "observed 'listings' on his computer." Additionally, a security guard at a medical clinic reported to police that defendant "was often seen with young women, and that one of these women tried to solicit the security guard for a prostitution date."

Beyond that, the warrant spelled out, with reasonable specificity, exactly what type of evidence of those particular crimes it was reasonable to believe would be found on defendant's computer:

> "Any and all evidence documenting the [crimes of promoting prostitution and compelling prostitution], to include: any and all digital images, digital video clips, and or photographs depicting [C], and/or any other as-of-yet unidentified females; Contact information: to include, telephone numbers, names, and electronic mail (email) addresses; private messages; data storage identifying information; SMS/text messages and history; emails[.]"

In our view, those specifications—which indicate that the evidence expected to be found on defendant's computer consists of images and videos of women he prostituted, contact information for people connected with the crimes, and communications about the crimes—satisfy the standard set by *Mansor II* for describing what evidence reasonably can be expected to be found on a computer:

"Following *Wheeler*[ *v. State*, 135 A3d 282 (Del 2016)]—and, indeed, general principles of search and seizure law—we agree that to satisfy the particularity requirement, a warrant must describe, with as much specificity as reasonably possible under the circumstances, *what* investigating officers believe will be found on the electronic devices. *** [F]or the reasons discussed above regarding the nature of digital evidence, the 'what' is a description of the *information* related to the alleged criminal conduct which there is probable cause to believe will be found on the computer."

*Id.* at 216 (emphases in original).

Finally, although defendant is correct that the warrant lacked temporal limitations, under *Mansor II*'s reasoning, that omission does not render the warrant unconstitutionally overbroad under the circumstances of this case. Addressing the need to include temporal limitations in a warrant for the search of a computer, the Supreme Court held:

"And we agree with the reasoning in *Wheeler* and the cases cited there that when a time-based description of the information sought on a computer is relevant and available to the police, it ordinarily should be set out in the affidavit, and the warrant should include that description. That said, analytically, 'temporal limitations' are more accurately seen as a way of identifying with greater specificity the 'what' that is being searched for, rather than as a separate, independently required element, in meeting the particularity requirement for a computer search."

*Id.* at 218.

As we understand that holding, temporal limitations generally should be included when "relevant and available." But, the omission of such limits is not, ultimately, problematic if such limitations are not "relevant and available to the police," and if the warrant otherwise adequately identifies with specificity the evidence expected to be found based on the probable cause determination. Here, as noted, the warrant was supported by probable cause that defendant was engaged in an ongoing enterprise promoting prostitution, and that evidence of that enterprise would be found on his computer. The warrant identified with specificity what the

evidence was. There is no indication that specific relevant time frames pertaining to that ongoing activity were "available to the police," and, given the ongoing nature of defendant's prostitution business, such limitations, to the extent relevant, are not highly so. Thus, under *Mansor II*, this is not a situation in which the omission of temporal limitations renders the warrant unconstitutionally overbroad.

The trial court therefore properly denied defendant's motion to suppress.

C.  *Merger*

This case raises a number of complicated merger issues under ORS 161.067 that we will address in sequence. Because it will take a while to walk through the analysis, the upshot is that the guilty verdicts on the promoting prostitution charges in Counts 2, 3, 14, 15, and 16 must merge. That conclusion flows from our subsidiary determinations that (1) under *State v. Fujimoto*, 266 Or App 353, 338 P3d 180 (2014), all of those counts involve the same criminal episode for purposes of ORS 161.067(2); (2) under the analytic framework established in *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000), each of those counts involves the same statutory provision for purposes of ORS 161.067(1); (3) each of those counts involves a single victim (the public) for purposes of ORS 161.067(2); and (4) finally, on this particular record, none of Counts 2, 3, 14, and 15, is separated by a "sufficient pause" from Count 16, so as to allow for entry of separate convictions for purposes of ORS 161.067(3).

We start by clearing the table of the merger issues that *Ramos* has taken out of contention. In his second, third, fourth, and fifth assignments of error, defendant contends that the trial court erroneously failed to merge various subsets of his convictions. Our conclusion that the convictions on Counts 1, 4, 5, and 6 must be reversed because the guilty verdicts were not unanimous means we need not reach the third assignment of error, which urges that the guilty verdicts on Counts 5 and 6 must merge, and the fifth assignment of error, which asserts that the guilty verdicts on Counts 1 and 4 must merge. Those particular merger issues may not arise on remand.

The resolution of defendant's remaining assignments of error requires us to answer four questions: (1) Are all the counts based on the same criminal episode for purposes of ORS 161.067? (2) If so, do they involve violations of "two or more statutory provisions" for purposes of ORS 161.067(1), or do they involve a single statutory provision? (3) If a single statutory provision, did the offenses involve separate victims for purposes of ORS 161.067(2)? (4) If the same criminal episode, a single statutory provision and a single victim, were the counts separated by a "sufficient pause" for purposes of ORS 161.067(3)?

*Criminal episode*. The first question we must address is whether all the counts involved the same criminal episode. Relying on the analysis in *Fujimoto*, defendant argues that all counts of promoting prostitution involve the same "criminal episode" or, at least, the same "criminal episode" as Count 16, which the state predicated on all of defendant's alleged prostitution-related activities, including those underlying the other charges. The state does not address *Fujimoto*, but argues that, notwithstanding the way Count 16 was charged and tried, ORS 161.067(3) allows for the entry of separate convictions because it is inferable that the violations underlying the other counts were separated by a sufficient pause from the violation underlying the conviction on Count 16.

As mentioned, Counts 2 and 3 were based on the jury's finding that defendant promoted prostitution in a particular incident involving S. Count 14 was based on the jury's finding that defendant promoted prostitution in a particular incident involving H. Count 15 was based on the jury's finding that defendant promoted prostitution in a particular incident involving N. Count 16 was based on the jury's finding that from April 1, 2014 to September 30, 2015—the time period in which the specific acts identified above occurred—defendant promoted prostitution by "own[ing], control[ling], manag[ing], supervis[ing] and otherwise maintain[ing] a prostitution enterprise." The state's theory on Count 16 was that, through all of his conduct, including the specific incidents of promoting involving S, H, and N, defendant promoted prostitution by maintaining a prostitution enterprise. The prosecutor argued in closing:

"And then Count 16. Who was managing these women? Who were these women paying? Who were these women doing it for? Who expected money out of these women? Who was organizing these women? The defendant[.]"

The prosecutor then repeated the same theory in rebuttal:

"And then, of course, owned, controlled, managed, or supervised. [Defendant] supervised multiple women. You heard there's four of them to engage in prostitution activity."

First, contrary to the state's argument, under *Fujimoto*, Counts 2, 3, 14, 15, and 16 all involve the same "criminal episode" for purposes of ORS 161.067 in view of how the state charged and tried Count 16. At issue in *Fujimoto* was whether multiple discrete counts of first-degree theft involved the same "criminal episode" as a count of organized retail theft that, as tried to the jury, encompassed the conduct underlying the discrete counts. 266 Or App at 354-56. We rejected the state's argument that the discrete nature of the first-degree theft counts meant that they involved a different criminal episode from the organized retail theft count:

"As best we understand it, the state reasons that, because the nine counts of first-degree theft do not merge with *each other*, they should not merge into the organized retail theft. The state asserts that the organized retail theft could not have involved the 'same conduct or criminal episode' as the first-degree thefts, given that each of the first-degree thefts was distinct from the others. The trial court, however, specifically noted that 'it is clear that all of the evidence in Counts 2 through 10 [first-degree theft] was part of Count 1 [organized retail theft],' and the state does not dispute that. That is, all of the first-degree thefts alleged in Counts 2 through 10 occurred within the temporal scope of the commission of the organized retail theft, and *** involved proof of the same elements. Nothing in ORS 161.067(1) or the case law interpreting it suggests that, because one of the offenses—the organized retail theft—occurred over a longer period of time than others, merger is precluded."

*Id.* at 356-57 (emphasis and brackets in original; footnote omitted).

Here, as with the first-degree theft counts in *Fujimoto*, Counts 2, 3, 14, and 15 each involve discrete acts of promoting prostitution that would not merge with each other. But Count 16, like the organized retail theft count in *Fujimoto*, covered the time period in which those counts occurred and was based on the evidence underlying those counts. The trial court expressly recognized this, stating that Count 16 was "part of the continuing course of conduct." That means that Counts 2, 3, 14, and 15 involve the same criminal episode as Count 16, even if, as was the case in *Fujimoto*, Counts 2, 3, 14, and 15 might not, on their own, involve the same conduct or criminal episode as each other.

Accordingly, the verdicts on Counts 2, 3, 14, 15, and 16 merge by default unless one of the ORS 161.067 exceptions to merger applies. *State v. Gensitskiy*, 365 Or 263, 281 n 5, 446 P3d 26 (2019) ("But it is important to bear in mind that, under ORS 161.067, merger is the default result; statutory violations based on the same conduct or criminal episode merge unless the circumstances described in ORS 161.067 exist."). Only if the record allows for the conclusion that one of the three subsections of ORS 161.067 bars merger, then may the court enter separate convictions based on separate guilty verdicts pertaining to the same conduct or criminal episode. *Id*. We consider, then, whether any of those three subsections preclude the merger that otherwise must happen by default.

*ORS 161.067(1)*. ORS 161.067(1), which is what we understand the trial court to have relied on to enter separate convictions on the counts of promoting prostitution, authorizes the entry of separate convictions when the same criminal episode violates separate statutory provisions, and each statutory provision requires proof of an element the other does not. ORS 161.067(1).

Defendant acknowledges that, in *State v. Wallock/ Hara*, 110 Or App 109, 111-12, 821 P2d 435 (1991), on which the trial court relied, we held that the individual paragraphs of ORS 167.012(1) "are separate statutory 'provisions' for purposes of ORS 161.067(1)," such that guilty verdicts based on separate paragraphs of the statute did not merge. But, defendant asserts, nine years after we decided *Wallock*,

the Supreme Court decided *Barrett*. In that case, the court explained how to determine whether two parts of the same statute qualify as "two or more statutory provisions" for purposes of ORS 161.067(1). *Barrett*, 331 Or at 31-36. Defendant points out that we did not employ that analysis in *Wallock*, and that the Supreme Court in *Barrett* expressly repudiated the analytic approach that we did take in *Wallock*, and he urges us to apply *Barrett*'s approach here to determine if ORS 161.067(1) precludes merger of guilty verdicts based on jury findings that the same criminal episode violated two or more of the four paragraphs of ORS 167.012. In defendant's view, under the analysis in *Barrett*, ORS 161.067(1) does not preclude merger.

In the state's view, we should continue to adhere to *Wallock*. The state argues in the alternative that, even if defendant is correct that *Barrett* has displaced *Wallock*, under the analysis in *Barrett*, the distinct paragraphs of ORS 167.012(1) constitute separate statutory provisions, each of which undisputedly requires proof of an element that the other does not, such that ORS 161.067 bars merger.

Since the time we decided *Wallock*, the Oregon Supreme Court has spoken extensively on merger law in a way that constrains any precedential value that *Wallock* may have. As we explain, we conclude that, under the analysis we must apply after *Barrett* and subsequent cases following it, the separate paragraphs of ORS 167.012(1) do not qualify as "two or more statutory provisions" for purposes of ORS 161.067(1), contrary to the conclusion in *Wallock*. Under the correct analysis, the paragraphs of ORS 167.012(1) are the same statutory provision for purposes of ORS 161.067(1). As a consequence, guilty verdicts based on findings that the same criminal conduct or episode violates distinct paragraphs of ORS 167.012 must merge, unless some other provision of ORS 161.067 operates to preclude merger.

In *Wallock*, the only question we asked and answered was whether the separate sections of ORS 167.012 required proof of "at least one element not involved in the others." 110 Or App at 111-12. Based on our conclusion that they did, we determined that ORS 161.067(1) barred merger of guilty verdicts finding that the same conduct or criminal episode

violated distinct sections of ORS 167.012. *Id.* What we did not do, however, is conduct the antecedent inquiry that subsequent Supreme Court cases require: whether the separate sections of ORS 167.012 constitute "two or more statutory provisions" or "separate statutory provisions" within the meaning of ORS 161.067(1). Although we called the distinct sections of ORS 167.012 "separate statutory provisions" in *Wallock*, we did so solely upon determining that each section required proof of an element that the other did not, as typically was our approach before *Barrett. See, e.g.*, *State v. Burnell*, 129 Or App 105, 108-09, 877 P2d 1228 (1994); *see also Bumgarner v. Nooth*, 254 Or App 86, 94-97, 295 P3d 52 (2012) (explaining how *Barrett* altered and clarified analysis of merger questions under ORS 161.067(1)).

In other words, *Wallock* undertook only half of the proper inquiry. Under *Barrett*, determining whether ORS 161.067(1) precludes merger entails two distinct steps: (1) whether the guilty verdicts in question are based on "two or more statutory provisions," and (2) if so, whether each of those provisions requires proof of an element the other does not. *Barrett*, 331 Or at 32 (stating that the Court of Appeals' practice at the time—examining just whether distinct sections required proof of elements that the others did not—incorrectly omitted the first step in the analysis). For that reason, we cannot rely on our conclusion in *Wallock* to decide this case but must conduct the inquiry that we omitted in that case.

"Whether two statutes (or two sections, subsections, or paragraphs of a statute) are 'separate statutory provisions' for the purposes of ORS 161.067 depends on whether the legislature intended to create two crimes as opposed to, for example, two ways of committing the same crime." *Gensitskiy*, 365 Or at 283; *State v. Jenkins*, 280 Or App 691, 695-96, 383 P3d 395 (2016), *rev den*, 360 Or 752 (2017). "[O]ur task is to determine whether the legislature's actions were directed at a 'broad, unitary risk or harm that could be triggered by any of several legally interchangeable means' or at 'distinct and particularized risks or harms.'" *Jenkins*, 280 Or App at 696 (quoting *State v. Crawford*, 215 Or App 544, 554, 171 P3d 974 (2007), *rev den*, 344 Or 280 (2008)). We

do so by examining the statute's "structure, text, context, and legislative history." *Id*.

Here, the structure, text, and legislative history of ORS 167.012 indicate that the different sections of the promoting prostitution statute target the same harm and define different ways of committing the same crime.

First, the structure of the statute indicates that the different provisions of ORS 167.012 set forth different ways of committing a single crime. As we explained in *Jenkins*, when a statute is structured with "a section that names the crime, followed by paragraphs that define alternative ways of committing the crime," that "indicates that the legislature intended to define one crime." 280 Or App at 696. That is exactly how ORS 167.012 is structured, with a general provision naming the crime followed by a list of ways the crime can be committed:

"(1)   A person commits the crime of promoting prostitution if, with intent to promote prostitution, the person knowingly:

"(a)   Owns, controls, manages, supervises or otherwise maintains a place of prostitution or a prostitution enterprise;

"(b)   Induces or causes a person to engage in prostitution or to remain in a place of prostitution;

"(c)   Receives or agrees to receive money, goods, property, services or something else of value, other than as a prostitute being compensated for personally rendered prostitution services, pursuant to an agreement or understanding that the money, goods, property, services or something else of value is derived from a prostitution activity; or

"(d)   Engages in any conduct that institutes, aids or facilitates an act or enterprise of prostitution.

"(2)   Promoting prostitution is a Class C felony."

ORS 167.012.

One additional structural feature points in the same direction. In ORS 167.012(1)(a) to (c), the legislature described fairly specific ways in which a person could commit the crime of promoting prostitution. Then, in the final

paragraph, ORS 167.012(1)(d), the legislature supplied what is, as a textual matter, a broad catch-all provision, prohibiting "any conduct" that furthers (that is, "institutes, aids or facilitates") "an act or enterprise of prostitution." That structural aspect—some relatively specifically defined ways of how the crime can be committed, followed by a broader, catch-all type provision—suggests that the legislature was simply attempting to describe the range of alternative ways the crime of promoting prostitution could be committed, and was not attempting to define separate crimes.

Text indicates the same thing as structure. It would be difficult to conclude that the paragraphs of ORS 167.012(1) target "distinct and particularized risks or harms." *Jenkins*, 280 Or App at 696 (internal quotation marks omitted). Each provision appears to be aimed at the generalized harm of being on the business side of a prostitution operation or arrangement, and the provisions overlap with each other in terms of the conduct that they address. For example, at least some (if not all) conduct that violates ORS 167.012(1)(a), which prohibits, among other things, "maintain[ing] *** a prostitution enterprise," would likely also violate the catch-all provision in ORS 167.012(1)(d), prohibiting "any conduct that institutes, aids or facilitates an act or enterprise of prostitution." In other words, the separate paragraphs of ORS 167.012(1) are not very distinct from one another.

Finally, legislative history also persuades us that the legislature's intention in enacting ORS 167.012 was to define different ways the same crime could be committed, rather than to define separate crimes. The statute was enacted as part of the comprehensive revision to the criminal code in 1971. The commentary to section 251, the provision that became ORS 167.012, states, "Section 251 creates a *single comprehensive offense* covering conduct characteristic of prostitution carried on as a commercial enterprise." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 251, 241 (July 1970) (emphasis added). As defendant correctly notes, the commentary then "explains that the offense 'is designed to reach the typical "panderer," "pimp" and "madam"' and describes how each paragraph accomplishes that single goal." (Quoting *id.*) The commentary further

indicates that the legislature sought to ensure that all such conduct received similar treatment for sentencing purposes. *See id*. at 241-42.

Given that expression of legislative intention to create a "single" offense, we conclude that that is what the legislature did in enacting ORS 167.012. The separate paragraphs of the statute do not define separate crimes but, instead, set forth alternative means of committing the same crime. They are, therefore, not separate statutory provisions for purposes of ORS 161.067(1), and that part of ORS 161.067 does not preclude merger here. *Wallock*, which failed to conduct the analysis required by *Barrett*, does not dictate a different result.

*ORS 161.067(2).* Next is ORS 161.067(2). It precludes merger if defendant's offenses involve "two or more victims": "When the same conduct or criminal episode, though violating only one statutory provision involves two or more victims, there are as many separately punishable offenses as there are victims." ORS 161.067(2). The question, consequently, is whether Counts 2, 3, 14, 15, and 16 involve two or more victims. The parties disagree on this point.

Defendant argues that the victim of the offense of promoting prostitution is the public, such that those counts all have the same victim. Defendant notes that the Criminal Law Commission proposed the statute in a section called "Offenses Against Public Health and Decency," something that, in defendant's view, signals an intention that the victim was the public. Defendant also points to commentary that suggests that the harm targeted by the offense was harm to society caused by commercial prostitution operations, not harm to persons who voluntarily choose to engage in prostitution.

The state argues that, on the counts involving the promotion of prostitution by an individually named woman, the individually named woman is the victim. In support of its argument, the state cites a number of other cases in which we have referred to the "prostituted individual" as the victim of the offense of promoting prostitution, although the state appears to recognize that we have never decided the question. The state contends that that "longstanding view"

is correct and should be imported to the analysis under ORS 161.067(2). The state also cites cases from Washington and Nevada in which the courts of those states have viewed the persons engaging in prostitution as the victims of the offense of promoting prostitution.

For purposes of ORS 161.067(2), we "determine[] who qualifies as a 'victim' by interpreting the substantive statute defining the relevant crime." *State v. Hamilton*, 348 Or 371, 376, 233 P3d 432 (2010). As we explained in *State v. Moncada*, 241 Or App 202, 212, 250 P3d 31 (2011), *rev den*, 351 Or 545 (2012):

> "Where the statute defining a crime does not expressly identify the person who qualifies as a 'victim,' the court examines the statute to identify the gravamen of the crime and determine the class of persons whom the legislature intended to directly protect by way of the criminal proscription."

In particular, we look to the harm targeted by the substantive criminal offense to identify who, in the view of the legislature, would qualify as a victim. *Jenkins*, 280 Or App at 698-99. Where the harm targeted by the offense is to the public, rather than to an individual, we have held that the victim of the offense is the public (or the state). *See id*. (concluding that the public, with its interest in the administration of justice, was the victim of the crime of witness tampering, not the individual witnesses).

Here, our consideration of the text, context, and, particularly, the legislative history of ORS 167.012 and the simultaneously enacted statutes targeting prostitution persuades us that the victim of the crime of promoting prostitution is the public at large.

First, nothing in the text of the statute suggests that the legislature viewed any particular individual as being harmed by the promoting activities that are prohibited. Rather, the text targets the range of ways a person can participate in the commercial sex industry, prohibiting those types of commercial activities, without giving any indication that the legislature viewed the harm occasioned by those activities to be a harm suffered by any particular participant in them.

Second, the context indicates that the legislature would not likely view any adult voluntarily engaging in prostitution as a victim. When it enacted ORS 167.012, the legislature also enacted ORS 167.007, which generally criminalizes sex-for-money transactions, and ORS 167.017, which criminalizes the conduct of compelling prostitution. By generally criminalizing sex-for-money transactions, the legislature suggested that it did not generally view voluntary participants in such transactions as crime victims, it viewed them as crime perpetrators. But by criminalizing compelling prostitution, the legislature indicated a view that, when compulsion plays a role in inducing a person to engage in sex-for-money transactions, the person compelled does suffer a harm rendering them a victim. In other words, context suggests that the legislature did not generally view persons engaged in prostitution and the related business aspects of it as victims unless participation was compelled. That indicates that the victim of the crime of promoting is the public, because that offense does not contain an element of compulsion.

The legislative history of the prostitution provisions bears this out. The commentary to the provision that ultimately became the general prohibition on prostitution, ORS 167.007, indicates that alternatives to criminalization were considered but none were found to be "socially acceptable": "The Commission is not convinced that the advocates of tolerated prostitution have formulated socially acceptable alternatives to prohibitory legislation. The proposed draft, therefore, is designed to maintain the existing pattern of the law in the United States." Commentary § 250 at 240. That suggests that the legislature's general concern was the harm to society, not the harm to individual participants voluntarily engaging in prostitution activities. The commentary to the provision that became ORS 167.017, which prohibits compelling prostitution, reflects a similar view that, absent compulsion, a participant in prostitution activity is not someone that the legislature perceived as a victim of that activity. That commentary explains:

"Section 252 particularizes three forms of promoting prostitution considered aggravating factors serving to increase the seriousness of the offense. It covers coercive

conduct characterized by force or duress, conduct that exploits the immature and that which victimizes a dependent person.

"Paragraph (a) of subsection (1) reflects the view that a prostitute's voluntary participation is a factor to be considered in measuring the culpability of the 'promoter.' The social and psychological pressures that draw a person into a life of prostitution are complex and varied. While penal legislation may never provide a fully effective deterrent to voluntary prostitution, the law should continue to apply forceful deterrents against the use of coercion."

Commentary § 252 at 242.

In view of the foregoing, we conclude that the harm targeted by ORS 167.012 is the social harm occasioned by the business of prostitution, not any harm suffered by individual participants in that business. That means each count of promoting prostitution involves the same victim—the public. Here, then, ORS 161.067(2) does not preclude merger.

*ORS 161.067(3)*. The remaining question is whether ORS 161.067(3) precludes merger. It provides that when

"the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

ORS 161.067(3). As we have explained, "to support the entry of multiple convictions for the same offense under ORS 161.067(3), one crime must end before another begins *and* each crime must be separated from the others by a sufficient pause in the defendant's criminal conduct to afford him an opportunity to renounce his criminal intent." *State v. West-Howell*, 282 Or App 393, 397-98, 385 P3d 1121 (2016), *rev den*, 361 Or 312 (2017) (emphasis in original). The state bears the burden of proving that the requisite sufficient pause is present. *State v. Barton*, 304 Or App 481, 499, 468 P3d 510 (2020).

In this case, in light of how the state charged and tried the case, the state did not meet that burden. Absent Count 16, and the state's decision to charge and try that count as one ongoing criminal episode, we would conclude that the record would support the entry of separate convictions on Count 2, Count 3, Count 14, and Count 15. Each of those counts involved distinct incidents separated in time and location.

But the fact that guilty verdicts on certain counts do not merge with each other does not end the analysis where, as here, each one of those verdicts merges with the verdict on another count. *Cf. Gensitskiy*, 365 Or at 296-97 (holding that, although guilty verdicts on individual identify theft counts did not merge with each other, each merged into guilty verdict on count of aggravated identity theft for single conviction; rejecting as contrary to the defendant's plea agreement state's argument that it should be permitted on remand to dismiss count of aggravated identity theft to allow for entry of multiple convictions on separate identity thefts); *Fujimoto*, 266 Or App at 356-57 (holding that, although individual guilty verdicts on counts of first-degree theft did not merge with each other, they each merged with guilty verdict on count of organized retail theft for single conviction). In this case, the conduct underlying Counts 2, 3, 14, and 15 cannot be separated from the conduct underlying Count 16 by a sufficient pause, or any pause. Count 16, as the state charged it and then presented it to the jury, was based on all of defendant's prostitution-related conduct, including that underlying Counts 2, 3, 14, and 15. As the trial court recognized, Count 16 was based on a continuing course of conduct. On this record, there is simply no way to meaningfully distinguish the conduct underlying Counts 2, 3, 14, and 15 from that underlying Count 16. Thus, ORS 161.067(3) does not preclude merger.

In short, as this case was charged and tried, Counts 2, 3, 14, 15, and 16 each involve the same criminal episode, and none of the provisions of ORS 161.067 preclude the guilty verdicts on Counts 2, 3, 14, and 15 from merging with the verdict on Count 16. Therefore, the guilty verdicts on Counts 2, 3, 14, and 15 each must merge with the guilty verdict on Count 16.

D.   *Remaining Issues*

In his sixth, seventh, and eighth assignments of error, defendant raises challenges to his sentence, contending that the trial court erred in reconstituting his criminal history score and imposing a compensatory fine. Our reversal of four of his convictions, and our conclusion that the guilty verdicts on the remaining counts must merge, obviate the need to address those questions, which may not recur on remand.

Convictions on Counts 1, 4, 5, and 6 reversed and remanded; reversed and remanded to address merger in a manner consistent with this opinion; remanded for resentencing; otherwise affirmed.